STATE OF IOWA, Appellee, v. JOHN C. BUTLER, Appellant.

**Criminal Law:** ASSAULT: EVIDENCE. In this prosecution for assault with intent to commit great bodily injury the evidence is held to require submission of the question of whether the accused was the aggressor, although the evidence of the prosecuting witness was materially different than that on a former trial.

**Same:** ASSAULT DEFINED: INSTRUCTIONS. An unlawful threat to do

violence though coupled with the present means and intention of carrying it into effect does not constitute an assault, there must also be an attempt to carry the threat into execution, or an overt act; and an instruction in effect that an actual injury need not be inflicted, it being sufficient if there was an unlawful threat or intent to do violence coupled with the means and intent to carry the threat into effect, was erroneous; as it permitted the jury to find that the unlawful threat constituted an assault although there was no attempt to carry it into execution.

Same: JURORS: QUALIFICATION: DISCRETION. Although the court has a large discretion in passing upon the qualification of jurors, still in a criminal prosecution where the complaining witness is an officer, care should be taken to secure an unprejudiced jury.

Same: EVIDENCE: SCOPE OF CROSS-EXAMINATION. Where a prosecuting witness materially changes his testimony on a second trial of the cause, the defendant should not be unduly restricted in his cross-examination concerning alleged contradictory statements.

Same: TERM OF IMPRISONMENT. The term of imprisonment under conviction on a former trial which was reversed should be deducted from the period of imprisonment under a second conviction.
Evans, J., dissenting.

*Appeal from Hamilton District Court.*—HON. C. G. LEE, Judge.

WEDNESDAY, APRIL 10, 1912.

DEFENDANT was indicted for the crime of an assault with intent to murder. Upon a second trial, the case having once before been in this court, he was convicted of an assault with intent to commit great bodily injury, and was sentenced to the county jail for the period of one year. He appeals.—*Reversed* and *remanded.*

*G. D. Thompson* and *D. C. Chase,* for appellant.

*George Cosson,* Attorney-General, and *John Fletcher,* Assistant Attorney-General, for the State.

DEEMER, J.—I. Upon a former appeal the facts as
they then appeared of record are quite fully set·forth in
the opinion, which is reported in 146 Iowa, 285. Upon

**1. CRIMINAL LAW:**
**assault: evi-**
**dence.**

the second trial the state relied entirely upon
the testimony of the prosecuting witness,
Young, who was the night policeman of the
city of Webster City, and he materially changed his testi-
mony on this second trial. We quote the following from
the record now before us:

I saw the defendant, Butler, on the morning of August
1, 1908. I was standing on the crossing between the
Buster Brown corner and· the savings bank. I was just
approaching the crossing at the time I first saw Butler. I
was approaching from the east, and was in the street, near
the center of the street. Mr. Butler was down the street
at about the Teed drug store, which is about one hundred
and twenty-five feet east. It was about fifteen minutes to
three. I was going over to meet the No. 1 passenger train,
which arrives about three sixteen. It was about thirty
minutes before that train was due that I first saw Butler.
Homer Howard was with me. A fellow by the name of
Chas. Wedding was with Butler. . . . When I first
saw Butler and Wedding, Homer was with me. Mr. Butler
was going west, walking very fast. Come up to where
we were with Wedding, probably within two or three feet.
I was in the middle of the street. Q. Now, when he came
within three feet of you, as you say, what was his man-
ner, what was his appearance? . . . He appeared to
be very angry. . . . Howard was the first to speak.
He said: 'Hello, John. Where was the explosion?' John
said: 'To hell with that explosion.' He came up prob-
ably two or three feet of us. He said: 'Young, I have
something to say to you. What the hell have you been
talking about my place?' And I noticed he had something
in his hand he tried to conceal under his coat. I did not
know at the time just what it was, but I kept looking. I
says: 'You have better go home, Butler. Coming up here
to make trouble. . . . If you come up here making
trouble, I will have to arrest you.' He said no damned
officer could make him go home; and Howard asked Butler

then 'what he had in his hand.' He said: 'Never mind what I got in my hand.' At that time Butler says: 'I have come up to get you, and I am going to kill you.' He said that to me. He looked right at me. I took my bicycle and laid it off to one side, and at that time I noticed his knife in the right hand. And I said: 'Howard, catch that hand.' Howard told him to give him that knife, and I thought I had better take hold of his hand, and at that time he make a slash at me with the knife. He struck at me, and I could not get back quick enough, and then I hit him with the club, and he fell down. Q. When was it with reference to the time that he struck you with a knife, that you say you struck him with your billy? A. He struck me with a knife, and then I struck him with the billy I had. Q. Can you give the jury some description of the knife from what you saw of it? A. The blade of it was about three and one-half inches long. I saw the blade of it, and he had his hand over the handle, and I could not see the handle. After I struck him with the billy, he went down and got right up again, and went to cutting me with the knife. When I got a chance to hit him with the billy, I told Howard to catch him. He finally took hold of his hand. I do not know what became of the knife. . . . Butler cut me with the knife first on the left side of my face. There is a scar there. It is from the cheek bone along about the lower part of the chin, about to the bone or close to it. . . . I did not see Butler take the knife out of his pocket that night. He first ask me if I had been talking about his place. Once before that I was coming up from my home to go on duty. On Senaca street we met. When he said he was going to get me, I says, 'All right, any time.' In a way I had been talking about his place before that. . . . Q. When John came up and asked you what you had been saying about his place, did you tell him you were not afraid of him or of his knife either? A. I do not remember of saying anything like that. Q. You don't remember saying that? A. No. I did not tell John what I was going to arrest him for. I could not say he was drunk. I had not heard of his committing any crime. . . . After he told me what he had come to do to me, I told him I would

have to arrest him.  Q. Then you hit him?  A. No, sir; he struck me first.  He struck me in the face, and that is what made the cut.  After that I hit him on the top of the head.

There is some little corroboration of this testimony in the cross-examination of the witness Howard, although this witness persisted in testifying as follows:

Q. State who struck the first blow?  A. I think that Young did.  I am sure that Young did.  Butler said 'What have you been talking about me and my place for?' and Young said, 'You go home and attend to your business.' Butler said, 'I won't go home.  I have a right here as well as you have.'  Young says, 'What you got in that hand there?'  Butler says, 'None of your damned business.' Young says, 'You got a knife.  Put that up, or I will hit you;' and Young hit him.  Q. Had Butler made any threats prior to that time?  A. Never only what I have said.  Q. Did he say anything about killing Young?  A. Not at that time.  I think that, after he knocked him down two or three times, he says, 'I will kill you.'  Q. I understand you to say on direct testimony here that Butler said to Young, 'What have you got in our hand?'  You did not mean that?  A. I do not think I said it.  I said that Young said, 'What have you got in your hand?'  He says, 'None of your damned business.'  And he says, 'You got a knife;' and Young says, 'Take hold of that hand.'

The witness Howard also changed his testimony in some respects on this second trial.  Manifestly there was enough in this testimony to take the case to a jury upon the question as to whether or not defendant committed the first assault, and it was for the jury to weigh this testimony in the light of the statements made by the prosecuting witness on the former trial.

II.  Many propositions are relied upon for a reversal; but, in view of the conclusion reached and of the fact that most of the questions presented will not arise upon a

retrial, we shall not consider all.  One of the most import-

*2. SAME: assault defined: instructions.*

ant and vital points in the case was, Who made the first assault?  And the trial court in his charge gave the following, among other instructions:

(4)  An assault is an unlawful attempt or threat, by violence, to do injury to the person of another.  To constitute an assault, it is not necessary that an actual injury be inflicted, but it is sufficient if there be an unlawful attempt or threat to do violence, coupled with the present means and intention of carrying the threat into effect or execution.

(14)  It is claimed by the defendant that whatever was done by him at the time and place charged in the indictment was justifiable, and done on his part in self-defense, to repel an unlawful assault made by the said Young upon the defendant.  The law recognizes the right of every person about to be injured to offer such resistance as to him, acting as a reasonably prudent person under the circumstances, appears to be necessary to prevent a threatened injury to his person.  It is also true that the danger which will justify the resort to self-defense need not be real, but only as would lead a reasonably prudent man to believe in its reality; and in estimating the nature of the imminence of the danger and in the choice of means to avoid it, or the amount of force to be used in repelling it, the excitement and confusion of the surrounding circumstances must be considered, and a person is not held to that cool, deliberate judgment, in estimating the danger or choice of means unaffected by excitement or danger and subsequently contemplating the situation.

The defendant contended that Young committed the first assault by striking him with a billy, and that he, Young, was not attempting to arrest him for any offense or supposed offense.  It was important to him that the instructions correctly defined an unlawful assault.  There was testimony that defendant had previously made threats against Young, and that he reiterated them just prior to

the affray in question, and it was also shown that defendant had a knife in his hand at the beginning of the trouble; but it is hornbook law that mere threats to do violence to the person of another, although coupled with the present ability to carry them into execution, do not constitute an assault. We quote the following from McClain's Criminal Law as an accurate statement of the law:

Where the offense consists of an attempt to do injury, there must be, as in other cases of attempt, something more than a mere intention. Some step must be taken toward carrying out the intent. Thus mere preparation is not enough, nor mere threats unaccompanied with any offer of violence, nor the presentation of a dangerous weapon without manifestation of intention to use it, or accompanied with language indicating the intention not to use it. But pointing a loaded weapon, with words indicating the intention to discharge it, is enough without an attempt made to actually discharge it; the further prosecution of the attempt being prevented by interference. Mere words will not constitute an assault, but words may be important as giving color to acts, and may make that an assault which would not otherwise be one. The line of criminality is to be drawn between menace only and violence begun to be executed. There must be an act in pursuance of a wrongful intent, and such an act must involve, as is frequently said, the present ability on the part of the assailant to commit the threatened injury. Thus, to constitute an assault with a weapon, it is necessary that the weapon should be presented at the party assaulted within the distance at which it may do execution. But, if there is intent to injure and the means resorted to is believed to be adapted to the end, it seems to be immaterial whether such means could have produced the injury intended. The question whether there is ability on the party of the assailant to inflict the threatened injury, as, for instance, in case of a gun loaded with powder only, whether the assailant is near enough to the assailed so that the discharge of the weapon thus loaded would inflict an injury, is for the jury; but it is not necessary that assailant, attempting to strike the assailed with a club or otherwise, be actually

within reach of him. It is enough if he be so near as to
cause imminent danger if not stopped that the injury will
be immediately inflicted; and the assault is completed if
the attempt has thus been made, although it has been inter-
rupted or abandoned before an injury has actually been
committed, the actual infliction of personal injury not being
necessary to an assault. If the threatened injury, coupled
with present ability to inflict it, is conditioned on the party
assailed refusing to do something which the assailant has
no right to require him to do, it will constitute an assault,
even though the conditions are complied with and therefore
no violence is used. (1 McClain's Crim. Law, section 232.)

As already indicated, the doctrine stated in the pre-
ceding section, in accordance with which actual threatened
injury is essential to constitute an assault, is not universally
recognized, and, indeed, the general proposition supported
by the weight of authority is that, if assailant makes
threats to injure, being in apparent position to carry them
out, and does acts with the apparent intention of carrying
them out, thus putting the assailed in fear, an assault is
committed, even though by reason of facts not known to
the person assailed it would be impossible for assailant to
commit the injury threatened. Thus to point a gun or
pistol at a person who does not know but that it is loaded,
and has no reason to believe that it is not, is an assault.
It is therefore unnecessary in such cases that the indict-
ment allege that the weapon was loaded or otherwise show
present ability to inflict an injury; but on this point au-
thorities to the contrary are cited in the preceding section.
(1 McClain's Crim. Law, section 233.)

Mr. Bishop, in his work on Criminal Law, says: "An
assault is any unlawful physical force, partly or fully put
in motion, creating a reasonable apprehension of immediate
physical injury to a human being; as raising a cane to
strike him; pointing, in a threatening manner, a loaded
gun at him, and the like." 2 Bishop's Crim. Law, section
23. "Words alone will not suffice for assault, 'notwith-
standing,' says Hawkins, 'the many ancient opinions to the
contrary.' There must be physical force. Even a threat
is not an assault if unaccompanied by an attempt or offer.

to strike." 2 Bishop's Crim. Law, section 25. "The mere quiescent existence of a force which if aroused would create a battery is not an assault. Forces of this sort are constantly around us and in our paths, and they are harmless. But it is an assault for one so to awaken and give motion to such a force as to put another into a real or apparent peril, imminent and immediate. In other words, there must be 'violence begun to be executed' in distinction from violence menaced." 2 Bishop's Crim. Law, section 30. These statements have ample support in the cases cited. See, also, *State v. Malcolm,* 8 Iowa, 413; *State v. Shepard,* 10 Iowa, 126; *State v. Cummings,* 128 Iowa, 522; *State v. Stoke,* 80 Iowa, 68; *State v. Cody,* 94 Iowa, 169; *Thompson v. Mumma,* 21 Iowa, 65; *State v. Leuhrsman,* 123 Iowa, 476. The instructions quoted are manifestly erroneous for the reason that thereunder a jury was justified in finding that an unlawful threat would constitute an assault, provided the person making the threat had the present means and intention of carrying the threat into execution, although he had made no attempt or committed no overt act.

III.    Some of the jurors should have been excused by reason of their prejudice and bias against the defendant. We should not reverse on this ground alone, for a discretion is necessarily lodged in the trial court

3. SAME: jurors: qualification: discretion.

in such matters; but, by reason of the fact that the prosecuting witness was an officer, care should have been taken to secure an unprejudiced jury.

IV.    The cross-examination of the prosecuting witness, in view of the change made in his testimony, was unduly restricted in some respects. The defendant should have been permitted to question this witness

4. SAME: evidence: scope of cross-examination.

regarding various contradictory statements made by him as to the presence of one Hurt at the time of the encounter. *Bothwell v. Farwell,* 74 Iowa, 324.

V. The defendant was given the maximum sentence for the crime of which he was convicted without deduction of time spent by him in jail under a previous sentence. This was erroneous. See Code, section 5468.

*5. SAME: term of imprisonment.*

VI. There is much doubt in our minds as to whether the court should have submitted the case on the theory that the prosecuting witness was attempting to arrest defendant at the time the encounter took place. At any rate, there is no such showing in this regard as would make defendant's resistance to Young's effort to take him into custody an assault, such as arises where one offers resistance to a lawful arrest by an officer. Our discussion on the second branch of this opinion has no reference to such an assault, and should not be so considered. The trial court was not endeavoring to cover this phase of the case in the instructions there considered.

For the errors. pointed out, the judgment must be again *reversed,* and the cause *remanded.*

EVANS, J. (dissenting).—I am quite convinced that there was no prejudicial error, if error at all, in instruction No. 4 given by the trial court.

There is scarcely a subject in the law more evasive of complete and accurate definition than "assault." Practical recognition of it in a given case is often easier than a legal definition of it. I know no definition of assault that is concise on the one hand and all comprehensive on the other. It is often defined as an unlawful attempt to do immediate and intentional violence to the person of another, coupled with the apparent ability to do such violence. Such a definition will cover perhaps a large majority of actual cases, and yet it does not comprehend them all. A familiar illustration of an assault which is not covered by such definition is the pointing of an unloaded gun at another. *State v. Shepard,* 10 Iowa, 126. Such an act is deemed to be

an assault, even though the person pointing the gun knows it to be unloaded, and can, therefore, have no intention to discharge it at the supposed victim. Such an act constitutes an assault in the sense that it partakes of the nature of a threat, which is calculated to put the other party in fear. I find no fault with the definitions quoted in the majority opinion. I only desire to suggest that no one of them will cover all cases of assault.

The excerpt quoted in the majority opinion from McClain's Criminal Law (volume 1, section 232) is an elaboration of the subject rather than a definition of the term; and I am in full accord with it. That discussion is by no means condemnatory of the instruction given by the trial court. The instructon as given was peculiarly applicable to the evidence, and should be considered, of course, in the light of the evidence. The evidence on behalf of the state was that Butler was coming down the sidewalk in the direction of Young, and was thus approaching him. When he had come within a few feet of him, he began an altercation, and manifested great anger. When within two or three feet of Young, he said: "I have come up to get you, and I am going to kill you." He had in his hand at that very moment an open knife with which he inflicted a severe wound upon Young a few moments later. When Young heard the threat and saw the open knife, and perceived the anger and apparent intention of Butler, he told Howard to "catch his hand," and he himself took "hold his hand." This was done before the wound was actually inflicted by Butler. The question for the jury at this point was, Who was the aggressor? This was the occasion for a definition of assault appropriate to the evidence. If Butler was the aggressor, then Young was justified in trying to disarm him. If Butler was not the aggressor, then necessarily Young was.

Assuming the truth of the testimony of Young, and assuming, further, that Butler was then actually intending

to execute his threat, it will hardly be denied that Butler was the aggressor. If so, he had committed an assault in some form and at some point in the development of the altercation. In the light of this evidence the trial court instructed: "An assault is an unlawful attempt or threat by violence to do injury to the person of another. To constitute an assault, it is not necessary that an actual injury be inflicted, but it is sufficient if there be an unlawful attempt or threat to do violence coupled with the present means and intention of carrying the threat into effect or execution." I grant that a "mere threat" is not an assault, and that an assault can not consist of "mere words" or "words only." Neither did the instruction under consideration permit the jury to find an assault from a "mere threat." It directed the jury that, in order to find an assault, it must find not only the "unlawful attempt or threat," but it must also find that Butler had the "present means and intention" to execute his threat. The additional circumstances to which this instruction was applied were the proximity of Butler's approach to Young, his anger, his open knife. Were these circumstances sufficient to warrant an inference by the jury of an intention by Butler to execute his threat? If so, the instruction permitted the jury to find Butler to be the aggressor. The instruction did not make the "mere threat" the criterion. By this instruction Butler's entire conduct at this point was put under scrutiny in order to determine his intention. His conduct culminated in the threat which gave color to his preceding acts. It revealed, also, the immediate peril to which Young was exposed, and it tended to put him in fear. Assuming the hypothesis of this instruction to be proved to the satisfaction of the jury, could the same jury find, even under a correct definition, that Young was bound to wait for some further overt act before availing himself of the right of self-defense? Can it be possible that his effort to disarm Butler under such a state of found facts

could be deemed an assault on his part? To quote from
1 McClain's Criminal Law, section 232: , "Mere words
will not constitute an assault, but words may be important
as giving color to acts, and may make that an assault which
would not otherwise be one." I am impressed myself that
the instruction was appropriate as applied to the evidence.
But, in any event, the instruction could not have been
prejudicial to the defendant, even though it be deemed in-
accurate in the respect urged. The instruction availed
nothing to the state, unless the jury should also find from
all the circumstances that the defendant was then intend-
ing to execute his threat. If he was so intending, then
his precedent acts in carrying an open knife and in ap-
proaching to within two or three feet of Young with such
intention was necessarily "violence begun." The statute
calls upon us in such a case as this to ignore "technical
errors or defects which do not affect the substantial rights
of the parties." Code, section 5462. If there is an error
here, it is to my mind thoroughly technical, and does not
affect the substantial right in the case. When we reflect
further that the word "assault" is a part of our common
speech; that it is used in the statute without definition;
that it is understood by everybody better than it can be
defined by anybody; and that failure to define it at all in
instructions to the jury constitutes no error, as we have
heretofore held—it emphasizes the want of prejudice ap-
pearing herein.

II. Referring to the excessive sentence, the time
served on the former sentence was twenty-one days. A re-
duction of the sentence to that extent can be ordered here
as well as in the lower court.